# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**ELIZABETH A. CZADZECK**
        **Plaintiff,**

        **v.**                                        **Case No. 20-C-803**

**ANDREW M. SAUL,**
**Commissioner of the Social Security Administration**
        **Defendant.**

---

## DECISION AND ORDER

In September 2017, plaintiff Elizabeth Czadzeck, then 59 years old, filed an application for social security disability benefits, alleging that she could no longer work due to a variety of medical conditions, including back and neck problems. The Administrative Law Judge ("ALJ") assigned to the case concluded that plaintiff suffered from severe spinal impairments, which limited her to a range of sedentary work and prevented her from performing her previous, more physically demanding jobs. However, the ALJ then determined that plaintiff had acquired skills from her past employment which would transfer to other sedentary occupations existing in significant numbers in the national economy. He accordingly found her not disabled.

Plaintiff now seeks judicial review, arguing that the ALJ erred in finding that she had acquired transferrable work skills, in discounting the opinion of one of her doctors supporting greater limitations, and in evaluating her statements regarding the severity of her symptoms. I first set forth the applicable legal standards before reviewing the record and addressing plaintiff's specific claims.

# I. LEGAL STANDARDS

## A.    Determining Disability

In determining whether a claimant is disabled, the ALJ applies a five-step sequential test.  20 C.F.R. § 404.1520(a)(4).  At step one, the ALJ determines whether the claimant is currently working at the level of substantial gainful activity.  Id. § 404.1520(a)(4)(i).  If not, at step two she asks whether the claimant has a severe medically determinable physical or mental impairment.  Id. § 404.1520(a)(4)(ii).  If so, at step three she determines whether any of those impairments qualify as conclusively disabling under agency Listings.  Id. § 404.1520(a)(4)(iii).  If not, the ALJ proceeds to step four, determining whether the claimant can, given her residual functional capacity ("RFC"), perform her past relevant work, id. § 404.1520(a)(4)(iv), either as she actually performed it or as it is generally performed in the national economy, id. § 404.1560(b)(2).  RFC represents the most a person can still do despite the physical and mental limitations caused by her impairments and any related symptoms.  Id. § 404.1545(a)(1).  If the claimant cannot perform past work, the ALJ determines at step five whether she can, given her RFC, age, education, and work experience, make an adjustment to other work.  If so, she is not disabled.  If not, she is disabled.  Id. § 404.1520(a)(4)(v).

ALJs typically rely on two sources in deciding whether a claimant can make the adjustment to other work: the Medical-Vocational Guidelines ("the Grids"), a chart that classifies the claimant as disabled or not disabled based on her age, education, work experience, and exertional (i.e., strength) ability; and vocational experts ("VE's"), who provide testimony on other jobs the claimant might be able to do given her RFC and other attributes.  See Fast v. Barnhart, 397 F.3d 468, 470 (7th Cir. 2005); see also Martin v. Saul, 950 F.3d 369, 376 (7th Cir. 2020);

2

Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999). Generally, the ALJ will first consider whether the claimant may be deemed disabled under the Grids based on exertional limitations alone; if so, the inquiry ends, regardless of any testimony from a VE theorizing other jobs the claimant could do. See Fast, 397 F.3d at 471 (citing Swenson v. Sullivan, 876 F.2d 683, 688-89 (9th Cir. 1989)).

The Grids generally divide claimants into three age categories: younger people (aged 18-49), those closely approaching advanced age (50-54), and persons of advanced age (55 or older), and three exertional categories: sedentary, light, and medium. See 20 C.F.R. pt. 404, subpt. P, app. 2, Rule 200.00. Previous work experience "is a bit more complicated. That factor, as it is incorporated into the Grids, requires not only identifying the skill level of a claimant's past work, but also deciding whether she has skills from past jobs that can be transferred to other positions." Martin, 950 F.3d at 376. "The transferability analysis is less searching for older workers, because the Administration does not expect claimants to change industries or work settings near the end of their careers." Id. For instance, if the claimant is of advanced age and limited to sedentary work, the skills must be transferable to skilled or semiskilled sedentary work, and that work must be so similar to her previous work that she would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry. 20 C.F.R. § 404.1568(d)(4). When transferability is material to the outcome, the ALJ must identify both the acquired work skills and the specific occupations to which those skills are transferable. SSR 82-41, 1982 SSR LEXIS 34, at *19; Abbott v. Astrue, 391 Fed. Appx. 554, 558 (7th Cir. 2010). The ALJ may obtain assistance from a VE in determining whether and how skills are transferrable, and in identifying potential jobs to which

3

the skills may be transferred. SSR 82-41, 1982 SSR LEXIS 34, at *10-11; <u>see, e.g.</u>, <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1043 (9th Cir. 2008).

Agency regulations also prescribe the method by which the ALJ will evaluate medical opinions regarding the nature and severity of the claimant's impairments. For claims like this one, filed after March 27, 2017, the ALJ will in evaluating a medical opinion consider: (1) the extent to which the objective medical evidence and the explanation presented by the medical source support the opinion ("supportability"); (2) how consistent the opinion is with the other evidence of record ("consistency"); (3) the nature and extent of any treating or examining relationship the source has with the claimant ("relationship"); (4) the source's specialty, if any ("specialization"); and (5) other factors, including the source's understanding of the social security disability program's evidentiary requirements. 20 C.F.R. § 404.1520c(c). The factors of supportability and consistency are the most important in determining how persuasive the ALJ finds a medical source's opinions to be. <u>Id.</u> § 404.1520c(b)(2).

Finally, the ALJ must in determining whether the claimant is disabled consider her alleged symptoms, including pain, and the extent to which those symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R. § 404.1529(a). Symptom evaluation is a two-step process. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *5. Second, once such an impairment has been shown, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work. <u>Id.</u> at *9. If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms

4

based on the entire record and considering a variety of factors, including the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; factors that precipitate and aggravate the symptoms; and the treatment or other measures the claimant uses to relieve the pain or other symptoms. Id. at *18-19; 20 C.F.R. § 404.1529(c)(3).

## B. Judicial Review

The court will uphold an ALJ's decision if it uses the correct legal standards, is supported by "substantial evidence," and contains an accurate and logical bridge from the evidence to the conclusion. Jeske v. Saul, 955 F.3d 583, 587 (7th Cir. 2020). "Substantial evidence is not a high threshold: it means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Karr v. Saul, 989 F.3d 508, 511 (7th Cir. 2021) (internal quote marks omitted). "To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses." Beardsley v. Colvin, 758 F.3d 834, 836-37 (7th Cir. 2014). If reasonable minds could differ over whether the claimant is disabled, the court must uphold the decision under review. Shideler v. Astrue, 688 F.3d 306, 310 (7th Cir. 2012).

In determining whether the ALJ made the required determinations and gave supporting reasons, the court reads the decision as a whole and with common sense. Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir. 2015). The court need not discount the ALJ's discussion of an issue simply because it appears elsewhere in the decision. Id. Nor is the ALJ required to discuss every piece of evidence; rather, she must sufficiently articulate her assessment of the record to assure the court that she considered the important evidence and to enable the court to trace the path of her reasoning. Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam).

5

If the court is satisfied that the ALJ considered the important evidence and the appropriate regulatory factors, review of the ALJ's resultant findings is deferential. See, e.g., Zoch v. Saul, 981 F.3d 597, 601 (7th Cir. 2020) ("We do not decide questions of credibility, deferring instead to the ALJ's conclusions unless patently wrong.") (internal quote marks omitted); Stepp v. Colvin, 795 F.3d 711, 718 (7th Cir. 2015) ("We uphold all but the most patently erroneous reasons for discounting a treating physician's assessment.") (internal quote marks omitted).

## II. FACTS AND BACKGROUND

### A.    Plaintiff's Impairments and Treatment

Plaintiff alleged disability beginning on April 23, 2017. On that date, she went to the emergency room, complaining of bilateral arm and hand numbness. She reported that approximately 45 minutes earlier, while working at Walmart as a cashier, she suddenly started dropping things and her grip strength decreased bilaterally. She also complained of a sore neck, which was normal for her. (Tr. at 296-97.) On exam, she displayed normal range of motion of the neck, shoulders, elbows, wrists, and hands, 4/5 bilateral grip strength, and 5/5 strength of the upper and lower extremities. (Tr. at 300-01.) Doctors obtained an MRI of the cervical spine, which revealed multi-level degenerative changes, spinal canal narrowing, and foraminal narrowing (Tr. at 292, 303), and an x-ray of the cervical spine, which revealed degenerative changes and subluxation of C3 on C4 and C4 on C5 (Tr. at 286, 305), prescribing Medrol Dosepak and Motrin, and discharging plaintiff home in good condition (Tr. at 296, 298, 307).

At a follow-up on May 17, 2017, plaintiff reported continued numbness and tingling in the bilateral arms, with no significant improvement from the Motrin and Medrol Dosepak. (Tr.

6

at 318.)  On exam, she had full range of motion with pain and weakness of the upper extremities to the examiner's resistance.  (Tr. at 319.)  She was referred to physical therapy and provided a muscle relaxer.  (Tr. at 322-23.)  However, plaintiff later reported that physical therapy refused to work with her because any type of evaluation she did produced significant dizziness.  (Tr. at 342.)

On June 12, 2017, plaintiff saw Dr. Shekhar Dagam, a neurosurgeon, who initially recommended epidural steroid injections and referred her for an EMG (Tr. at 341-46), which revealed evidence of bilateral C7 and left C6 mild, chronic radiculopathy (Tr. at 350).  During a follow-up visit on August 30, 2017, plaintiff reported that the injections failed to provide lasting pain relief, and Dr. Dagam then recommended cervical fusion surgery (Tr. at 326-32).  His exam at that time revealed 5/5 grip strength and 5/5 strength of the upper and lower extremities, grossly intact sensation, and normal gait.  (Tr. at 331.)

On September 26, 2017, plaintiff reported continued neck pain and bilateral arm weakness.  She stated that she could not use her hands for days at a time if she did too much; something as simple as combing her hair or doing the dishes prevented use of her hands for several hours.  (Tr. at 323.)  On exam, the provider noted decreased strength in both bilateral upper and lower extremities.  "However it almost seems exaggerated or she is not trying.  She walks slow and uncoordinated down the hallway to the exam room."  (Tr. at 324.)

During a November 14, 2017, pre-operative exam with Dr. Dagam, plaintiff reported continued pain at the base of her neck, radiating upwards to the occipital lobe, as well as pain extending into the bilateral upper extremities, greater on the right.  She continued off work and presented forms for disability.  (Tr. at 362.)  On exam, she displayed 5/5 strength of the upper and lower extremities, appropriate muscle tone and bulk, grossly intact sensation, and normal

7

gait. (Tr. at 366.) Dr. Dagam diagnosed cervical radiculopathy, cervical pain, and cervical degenerative disc disease, planning to proceed with the surgery (Tr. at 366-67), which he performed on November 30, 2017 (Tr. at 368-70).

During a post-operative follow-up with Dr. Dagam in December 2017, plaintiff reported that she no longer experienced dizziness or sharp head pain. While she continued to have some pain throughout her upper extremities, it was not as intense. She did continue to experience numbness and tingling in her hands. Overall, she felt she was slowly improving and was pleased with her progress. (Tr. at 665.) On exam, she displayed 5/5 strength of the upper and lower extremities, appropriate muscle tone and bulk, grossly intact sensation, and normal gait. (Tr. at 669.)

During an annual physical exam with her family doctor in January 2018, plaintiff demonstrated normal gait, full range of motion, 5/5 strength of the upper and lower extremities, and no focal neurological deficits. (Tr. at 531, 544.) During a follow-up with Dr. Dagam later that month, plaintiff reported that the sharp headaches and dizziness had returned, but her upper extremity pain, numbness, and tingling was nearly gone. She reported 60% reduction in her pain overall. (Tr. at 675.) On exam, she displayed 5/5 grip strength, 5/5 finger extension, 5/5 pinch strength, and 5/5 biceps, triceps and deltoid strength, as well as 5/5 strength throughout the lower extremities. (Tr. at 679.) She ambulated with a normal gait. She was to begin weaning off the cervical collar and continue with Tylenol for pain control. (Tr. at 680.)

In February 2018, plaintiff continued to complain of headaches several times per week, but her upper extremity pain, numbness, and tingling was nearly gone. She did report difficulty opening containers and dropping things. She had successfully weaned herself from the

8

cervical brace.  (Tr. at 685.)  On exam, she again displayed 5/5 grip strength, 5/5 finger extension, 5/5 pinch strength, and 5/5 biceps, triceps and deltoid strength, as well as 5/5 strength throughout the lower extremities, ambulating with a normal gait.  (Tr. at 689.)  Dr. Dagam referred her to physical therapy for strengthening and flexibility in the neck, continued Tylenol for pain control, and referred her to neurology regarding the headaches.  (Tr. at 689-90.)  In March 2018, plaintiff complained that the therapy exacerbated her symptoms.  (Tr. at 694.)

In April 2018, plaintiff reported returning pain radiating through, and weakness in, her right arm.  She also reported pain in her back with numbness and weakness in her legs.  She indicated that these symptoms made her nervous, as she was in the process of adopting a child and did not want her arms or legs to give out while holding him.  (Tr. at 699.)  Dr. Dagam noted that she had full range of motion in the bilateral upper extremities when observed motioning and talking with her arms, but she had difficulty abducting at the right shoulder when asked; she also had giveway weakness throughout the entire right upper extremity on exam.  Dr. Dagam obtained a cervical MRI to assess any changes and a lumbar MRI to assess back pain and lower extremity weakness.  (Tr. at 704.)

In May 2018, plaintiff continued to complain of low back pain and leg numbness.  (Tr. at 710.)  The lumbar MRI demonstrated moderate facet degenerative and hypertrophic change at L2-3, moderate disc bulge at L3-4, and moderate to severe facet degenerative and hypertrophic change at L4-5.  (Tr. at 715-16, 946-47.)  The MRI of the cervical spine showed stable post-operative changes, intact hardware, and mild to moderate right foraminal stenosis at C4-5.  Dr. Dagam provided a referral for lumbar epidural steroid injections and a prescription for cyclobenzaprine for cervical muscle spasm.  (Tr. at 716.)

9

In July 2018, plaintiff saw the pain management provider, Cyril Philip, M.D., reporting onset of low back pain three months ago, which affected her ability to perform household chores. (Tr. at 599.) She did report being independent with activities of daily living and being able to drive. (Tr. at 600.) Dr. Philip recommended physical therapy and scheduled an injection. (Tr. at 602.) Later that month, plaintiff returned to Dr. Dagam, continuing to complain of the same symptoms, as well as hypersensitivity with touch to her anterior lower legs, greater on the right. She was scheduled to receive an injection the following month. (Tr. at 722.) She reported that the cyclobenzaprine provided some relief of her cervical area symptoms. For the lumbar symptoms, Dr. Dagam recommended she proceed with the injections and physical therapy. (Tr. at 727.)

In August 2018, Dr. Philip provided the epidural injection. (Tr. at 629-35.) Later that month, plaintiff saw her family doctor regarding cervical radiculopathy and low back pain. (Tr. at 743-44.) On exam, she displayed a normal gait, moved all four extremities spontaneously, and had 5/5 strength in the lower extremities. (Tr. at 747.) The provider continued her on Tizanidine and cyclobenzaprine. (Tr. at 748.)

Plaintiff returned to Dr. Philip in September 2018, reporting a 50% reduction of pain from the injection. (Tr. at 753.) On exam, she displayed 5/5 strength and intact sensation of the lower extremities. Her gait was antalgic. Dr. Philip discontinued Tizanidine and Flexeril (cyclobenzaprine) and started Baclofen. (Tr. at 756.) Plaintiff also saw Dr. Dagam that month, reporting no definitive improvement of low back pain from the therapy and injection; she did not want to pursue any additional injections. (Tr. at 731.) She was in the process of obtaining a TENS unit. Dr. Dagam recommended she continued with therapy and use the TENS unit; he did not feel surgical intervention would be beneficial. (Tr. at 737.)

10

Physical therapy notes indicate that plaintiff attended six sessions from 8/27/18 to 10/19/18. (Tr. at 962-86.) She was slated to attend twice per week for 12 weeks (Tr. at 967) but discharged on 10/19/18 after six visits due to not scheduling any more appointments (Tr. at 986).

In December 2018, plaintiff returned to Dr. Philip, reporting that she completed physical therapy and continued to do a home exercise program and to use her TENS unit. She complained of continued neck pain radiating into the bilateral hands. (Tr. at 803.) On exam, she displayed 5/5 strength of the lower extremities and intact sensation in the upper extremities. (Tr. at 806.) Her gait was not antalgic. Dr. Philip referred plaintiff to Dr. Ofer Zikel regarding her cervical symptoms and carpal tunnel syndrome. (Tr. at 807.) The record does not appear to contain further treatment notes related to her cervical issues.

In January 2019, plaintiff saw her family doctor for an annual physical exam. (Tr. at 901.) The provider noted full range of motion and 5/5 strength of the upper and lower extremities, and a normal gait. (Tr. at 905.)

On March 13, 2019, Dr. Dagam completed a medical source statement opining that plaintiff could lift less than 10 pounds frequently, 10 pounds occasionally, and 20 pounds less than occasionally. She needed a sit/stand/walk option at will and could work just two to three hours per day. In an eight-hour workday, she could sit for two hours, stand for 30 minutes, and walk for 30 minutes. She would need more than four unscheduled breaks, of 30 minutes duration, would likely be off task 75% of the workday, and would miss more than four days per month. (Tr. at 995.) She could never crouch or kneel, and stoop less than occasionally. She could use her hands for grasping and fingering just 25% of the time and never reach overhead or forward. Dr. Dagam checked a box indicating that his treatment and care, office visit notes,

11

and/or signs or laboratory findings formed the basis for his opinions. (Tr. at 996.) However, the form report contained no narrative explanation for the limitations.

Also on March 13, 2019, Dr. Dagam completed an arthritis medical source statement, indicating he had seen plaintiff about every two months since June 12, 2017, and listing diagnoses of cervical radiculopathy, cervical pain, and lumbar pain with a guarded prognosis. He listed symptoms of pain, fatigue/reduced endurance, headaches, and muscle spasms, and objective signs of reduced range of motion of the cervical spine and muscle spasm. (Tr. at 998.) He opined that plaintiff could walk two blocks without rest or severe pain, and continuously sit for 45 minutes and stand for 30 minutes. In an eight-hour workday, she could stand/walk less than two hours and sit for about two hours. She required a job that permitted shifting positions at will, including a period of walking around every 45 minutes, for five minutes. (Tr. at 999.) In addition to normal breaks, she required four additional breaks, lasting 30 minutes, where she needed to lie down or sit quietly. She could lift less than 10 pounds frequently, 10 pounds occasionally, and 20 pounds rarely. She could rarely twist or stoop, and never crouch. She could use her hands for grasping and fingering just 25% of the day. (Tr. at 1000.) She would be off task 25% or more of the time. Her symptoms would produce good and bad days, with more than four absences per month. Dr. Dagam checked a box indicating that plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described in the report. (Tr. at 1001.)

**B.  Procedural History**

    **1.  Plaintiff's Application and Agency Decisions**

In her application, plaintiff alleged that she became disabled as of April 23, 2017, due to cervical spine issues, bilateral knee replacement, migraines, memory loss, dizziness, nerve issues, blurred vision, carpal tunnel, and sleep disturbance.  (Tr. at 175, 177, 202, 206.)  She reported past employment as a customer service manager in retail (Walmart) and a move coordinator specialist for a moving/transportation company (All Right Moving and Storage).  (Tr. at 207, 224.)  In the retail job, she supervised cashiers and provided service desk support.  (Tr. at 225.)  In the transportation job, she did paperwork for drivers, set up loads, did computer work, and acted as a military liaison; she also helped with packing and loading in the warehouse.  (Tr. at 226.)

In a function report, plaintiff indicated that her impairments limited her ability to stand, walk, lift, and use her arms.  (Tr. at 215.)  She reported that she slept for no more than three or four hours at a time, that she needed help dressing and washing her hair (Tr. at 216), and that she cooked only simple meals and performed only light household chores (Tr. at 217).  She indicated that she could lift only light objects and walk just two blocks before she needed to stop and rest.  (Tr. at 220.)  She did not report using a cane, walker, or other assistive device to get around.  (Tr. at 221.)  In a physical activities addendum, plaintiff reported that she could continuously sit for two hours, stand for one hour, and walk for 30 minutes; in a day, she could sit for 10-16 hours, stand for three hours, and walk for 1-½ hours.  Her doctor had limited her to lifting 10 pounds or less.  (Tr. at 223.)

The agency denied the application initially on November 2, 2017 (Tr. at 114), based on the review of Mina Khorshidi, M.D., who concluded that plaintiff could perform light work, with occasional climbing of ladders, ropes, and scaffolds (Tr. at 70-79). Plaintiff requested reconsideration (Tr. at 119), indicating in a function report that she needed help with dressing and bathing (Tr. at 242), did limited housework (Tr. at 243), and could lift no more than 10 pounds and walk about 20 minutes before she had to stop and rest (Tr. at 246). On January 23, 2018 (Tr. at 121), the agency maintained the denial based on the review of Marcia Lipski, M.D., who concluded that plaintiff could perform light work with occasional postural movements and limited reaching overhead (Tr. at 90-99). Plaintiff then requested a hearing before an ALJ. (Tr. at 133.)

**2.    Hearing**

On April 10, 2019, plaintiff appeared with counsel for a video hearing before the ALJ. The ALJ also summoned a VE. (Tr. at 37-38.)

Plaintiff testified that she lived in a house with a roommate, who was retired, and her 18-month-old adopted child. (Tr. at 39-40, 48.) She indicated that she experienced pain in her neck, shoulders, arms, hips, lower back, knees, legs, ankles, and feet, which she addressed by adjusting positions (including laying down several times per day), taking muscle relaxers and Tylenol, and using a TENS machine. (Tr. at 44-45, 59-60.) She had tried physical therapy and injections, which did not work. (Tr. at 45.) Plaintiff testified that she had previously undergone cervical fusion surgery with Dr. Dagam. (Tr. at 57.) She stated that she got no relief from the surgery and had been told that she was not a candidate for further procedures. (Tr. at 58.)

Plaintiff testified that she could walk 100-150 feet, stand for 15 minutes, sit for 20-30 minutes, and lift less than 10 pounds. (Tr. at 45.) She further indicated that she had trouble

14

bending, stooping, crouching and kneeling (Tr. at 45), reaching overhead, and reaching out in front. She also reported difficulty using her hands, indicating that she sometimes had trouble holding a fork or spoon to feed herself because her hands were numb. She slept maybe four hours per night due to pain. (Tr. at 46.) She testified that she could not do laundry because she could not carry a laundry basket or hold clothes to fold them. (Tr. at 46-47.) She also denied being able to clean, take out the garbage, or perform lawn work. (Tr. at 47.) She indicated that she could change her child's diaper, but her roommate bathed the child. (Tr. at 47-48.) She could not lift the child. (Tr. at 50.) She could drive only short distances. (Tr. at 48.) She had a dog and let it in and out but did not feed it. (Tr. at 48-49.) Her ex-husband took her grocery shopping; she pushed the cart and told him what to put in it. (Tr. at 62.) Plaintiff concluded by stating that she lived in constant pain 24/7, her legs collapsed without notice, her arms quit working, she could not wash her hair, and she needed help in and out of the shower. (Tr. at 51.) She had not been prescribed a cane or walker; they didn't think it would help because of the collapsing, and she could not lean on a walker because of her arms. (Tr. at 65.)

The VE questioned plaintiff about her past work. Plaintiff indicated that her work for All Right Moving involved some physical work (packing trucks and boxes) and some office work (doing paperwork for the military). (Tr. at 42.) She also worked as a front-end supervisor at Walmart, in charge of the cashiers and customer service. (Tr. at 43.)

The VE testified that the work for All Right Moving was a composite job consisting of "mover/helper" (heavy, semi-skilled work) and "administrative clerk" (light, semi-skilled work). (Tr. at 52-53.) He classified the job at Walmart as "customer service manager" (medium,

15

skilled). He then testified that there would be transferrable skills from the administrative clerk and customer service manager jobs. (Tr. at 53.)

The ALJ asked a hypothetical question, assuming a person of plaintiff's age, education, and experience, limited to sedentary work, with a sit/stand option after sitting for 30 minutes, no more than occasional climbing and reaching overhead, and reaching in other directions and using the hands no more than frequently. (Tr. at 53-54.) Asked if such a person could perform other jobs using transferrable skills, the VE identified skills in verbal and numerical recording and record-keeping, general clerical processes, and use of general office equipment, which would transfer directly into positions such as hospital admittance clerk, appointment clerk, and sorter, all semi-skilled jobs. (Tr. at 54.) Asked about the vocational adjustment required for these jobs, the VE responded that the worker would have all the requisite skills so there would just be a general adaptation to different surroundings. He further testified that the skills plaintiff had acquired were highly marketable, with demonstrated abilities to handle administrative tasks and deal with people as a customer service manager would. (Tr. at 55.)

The VE testified that employers expect workers to be on task 85% of the workday or better and would tolerate missing up to two days in a 30-day period. (Tr. at 55-56.) Employers would not allow the worker to lie down during the day. (Tr. at 56.)

On questioning by plaintiff's counsel, the VE testified that it did not make a difference, in terms of transferrable skills, that the job at All Right was a composite job. (Tr. at 65.) He also clarified that while plaintiff would be working in a different environment, the things she would be doing would be things that she would already have skills in. (Tr. at 66.)

Turning to the previous hypothetical, counsel added that the person was not able to reach out in front, and the VE stated the jobs would be eliminated. (Tr. at 66-67.) He clarified

16

that the identified jobs required frequent reaching out in front. (Tr. at 67.) A limitation to occasional reaching in front would preclude those jobs. (Tr. at 67.) Similarly, a limitation to occasional use of the hands for gripping, grasping, and fine manipulation would eliminate the jobs. (Tr. at 67-68.)

### 3. ALJ's Decision

On May 31, 2019, the ALJ issued an unfavorable decision. (Tr. at 14.) Following the five-step process, the ALJ concluded that plaintiff had not engaged in substantial gainful activity since April 23, 2017, the alleged onset date (Tr. at 19); that she suffered from several severe impairments, including cervical and lumbar spine disorders, obesity, hypertension with atrial fibrillation, and hyperlipidemia (Tr. at 19), none of which met or equaled a Listing (Tr. at 20-23); that she had the RFC to perform sedentary work, with occasional postural movements, occasional overhead reaching, no more than frequent reaching in all other directions, no more than frequent use of the hands to handle, finger, and feel, and a sit/stand option allowing her to stand for one to two minutes after sitting for 30 minutes (Tr. at 23), which precluded performance of her past work as a customer service manager and the composite job of mover helper/administrative clerk (Tr. at 29); but that she had acquired work skills which were transferrable to other sedentary jobs existing in significant numbers (Tr. at 30).

In determining RFC, the ALJ considered plaintiff's allegations of pain, dizzy spells, and significantly reduced activities. (Tr. at 23-25.) The ALJ concluded that while plaintiff's impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence of record. (Tr. at 25.) In support of this finding, the ALJ cited various inconsistencies between plaintiff's claims and the evidence

17

of record.  (Tr. at 25.)

For instance, while plaintiff testified that her legs gave out and she had trouble walking, there was no evidence of her using an assistive device.  (Tr. at 25.)  Plaintiff alleged that she had difficulty washing her hair and holding a spoon to feed herself because her hands were numb, but these claims were inconsistent with the objective records, which showed at most mildly reduced grip strength and mild radiculopathy (Tr. at 25-26) and generally full range of motion of the extremities (Tr. at 27).  In rejecting greater limitations in use of the hands, the ALJ noted that plaintiff had 4/5 strength in her hands in April 2017 but 5/5 strength at a January 2019 physical exam.  (Tr. at 28.)  The ALJ also rejected greater limitations in reaching based on plaintiff's activities including diapering her child, driving, and shopping.  (Tr. at 28.)  The ALJ further noted that plaintiff reported improvement in her symptoms following the November 2017 surgery (Tr. at 26) and in July 2018 she admitted to a provider that she was independent with her activities of daily living (Tr. at 28).  Plaintiff alleged that she slept just four hours per night due to pain, but that was also not supported in the record.  (Tr. at 25.)  Plaintiff testified that she could not wash laundry but admitted that she could change her child's diapers and provide the child snacks.  (Tr. at 25.)  The ALJ concluded that plaintiff's complaints of pain had been accommodated with sedentary work with further restrictions on postural movements, handling, and reaching, with a sit/stand option.  (Tr. at 25, 27.)  The ALJ also observed that plaintiff sat comfortably at the hearing and considered this in limiting her to sedentary work.  (Tr. at 28.)

The ALJ also considered the medical opinion evidence, starting with the reports of the agency reviewing consultants, who found plaintiff capable of a range of light work.  The ALJ found these opinions overall persuasive but limited plaintiff to sedentary work based on the additional evidence received at the hearing level and in order to accommodate plaintiff's pain

18

complaints.  (Tr. at 28.)

The ALJ then turned to the reports from Dr. Dagam, who opined that plaintiff was limited to less than the full range of sedentary work, would be off task 75% of the time, would miss more than four days of work per month, and could never use her arms and rarely use her hands.  The ALJ found that these opinions were not persuasive.  The ALJ acknowledged that plaintiff had surgery in November 2017 but found that the record did not support such extreme limitations.  (Tr. at 28.)  For instance, plaintiff had 4/5 strength in her hands in April 2017 and 5/5 strength at a January 2019 physical exam.  (Tr. at 28.)  The ALJ also cited evidence that plaintiff tended to exaggerate her limitations, with a provider noting during a September 2017 exam that her weakness "seems exaggerated or she is not trying."  (Tr. at 29.)  The ALJ considered this evidence in concluding that the treaters, including Dr. Dagam, might not have had an objective basis for their opinions, further noting that Dr. Dagam provided no support for the checked boxes and limitations set forth in his form reports.  (Tr. at 29.)

Finally, on the work skills issue, the ALJ relied on testimony from the VE that skills obtained from the administrative clerk and customer service manager jobs were transferrable to sedentary work with the other limitations in the RFC.  (Tr. at 29.)  Those skills included knowledge of records, verbal skills such as providing information, knowledge of general clerical processes and procedures, and use of general office equipment.  The VE testified that such skills were transferable to sedentary, semi-skilled jobs such as hospital admitting clerk, appointment clerk, and sorter.  The ALJ further found, regarding tools and processes, that very little vocational adjustment was needed.  The VE testified that the only problem would be an adjustment to workplace setting (not tools or work processes) but only "little change" would be needed.  The VE emphasized that plaintiff had all the skills needed to do these jobs and that

19

just the surrounding would be different.  The VE further stated that plaintiff's skills were highly

marketable; the ability to handle administrative tasks and deal with people as plaintiff did in the

customer service area transfer well.  (Tr. at 30.)  The ALJ concluded:

> Based on the testimony of the vocational expert, the undersigned concludes that
> the claimant has acquired work skills from past relevant work that are
> transferrable to other occupations with jobs existing in significant numbers in the
> national economy.  The vocational expert testified the claimant's previous work
> is so similar to the jobs recited above that the claimant would need to make very
> little, if any, vocational adjustment in terms of tools, work processes, work
> settings, or the industry.

(Tr. at 30-31.)

On May 4, 2020, the Appeals Council denied plaintiff's request for review (Tr. at 1),

making the ALJ's decision the final word from the Commissioner on plaintiff's application.  See

Jozefyk v. Berryhill, 923 F.3d 492, 496 (7th Cir. 2019) ("Because the Appeals Council denied

review, we evaluate the ALJs decision as the final word of the Commissioner.").  This action

followed.

### III.  DISCUSSION

**A.    Transferrable Work Skills**

Plaintiff notes that, but for the ALJ's finding that she had acquired transferrable skills,

she would have been deemed disabled under the Grids based on her age and sedentary RFC.

(Pl.'s Br. at 7.)  She states that in her past relevant jobs she did paperwork for the military at

All Right Moving and was in charge of the cashiers and front-end customer service at Walmart.

The ALJ determined that plaintiff had acquired skills from these positions transferrable to work

as a hospital admittance clerk, which (according to the Dictionary of Occupational Titles)

involves interviewing incoming patients, explaining hospital regulations, and entering patient

20

admitting information; appointment clerk, which involves scheduling appointments, recording appointments, providing reminders, and receiving payments; and sorter, which involves sorting data such as forms, correspondence, checks, and bills for purposes such as filing, mailing, or preparing records. (Pl.'s Br. at 7-8.) Plaintiff argues that, while the regulations require there be "very little, if any vocational adjustment" for persons like her (of advanced age), these jobs are completely different from her past jobs. (Pl.'s Br. at 8.) She wonders how she could work as a hospital admitting clerk at a high degree of proficiency and with a minimal amount of orientation, as SSR 82-41 requires, given that none of her past work is remotely related to work in a hospital or hospital type setting. (Pl.'s Br. at 8-9.) She contends that simply looking at the job duties of the three positions identified shows the ALJ's legal error. (Pl.'s Br. at 9.)

The ALJ did not rely on her own intuition that plaintiff could make the adjustment to these jobs. Rather, she obtained testimony from a VE on the issue. The VE, in addition to reviewing the record (Tr. at 52), questioned plaintiff about her job duties (Tr. at 42-43). He then described the transferrable skills she had acquired from these jobs (Tr. at 54), identified three jobs to which those skills would transfer directly (Tr. at 54-55), and explained the vocational adjustment required (Tr. at 55, 66). Plaintiff did not object to the VE's qualifications at the hearing (Tr. at 52), nor does she specifically object to his testimony that she had acquired these skills from her past work. See Daniels v. Astrue, 854 F. Supp. 2d 513, 528 (N.D. Ill. 2012) (holding that ALJ did not err in relying on VE testimony that the claimant possessed specific transferrable skills, such as verbal and numerical recording and record keeping knowledge).

Plaintiff relies on the requirement that there be "very little, if any, vocational adjustment," SSR 82-41, 1982 SSR LEXIS 34, at *14, but she overlooks the Ruling's explanation that "where

21

job skills have universal applicability across industry lines, e.g., clerical, professional, administrative, or managerial types of jobs, transferability of skills to industries differing from past work experience can usually be accomplished with very little, if any, vocational adjustment where jobs with similar skills can be identified as being within an individual's RFC." Id. at *15. In this case, the VE specifically identified clerical, administrative, and managerial skills. (Tr. at 54-55.) Plaintiff notes that she never worked in a hospital setting, but the VE explained that she would have all the requisite skills so there would just be a general adaptation to different surroundings. (Tr. at 55.) On questioning by plaintiff's counsel, the VE acknowledged that a hospital is "certainly a different environment. But the skills and the things that she would be doing would be things that she would already have skills in[.]" (Tr. at 66.)

In any event, even if a hospital setting would be too different, plaintiff develops no argument that adjustment to the other positions would be too great. The VE identified 50,000 appointment clerk and 30,000 sorter jobs in the national economy, and plaintiff makes no claim that these are not significant numbers. See, e.g., Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997) (finding 30,000 jobs significant). Accordingly, even if the ALJ erred in relying on the hospital clerk position, any error would be harmless. See Nicholson v. Astrue, 341 Fed. Appx. 248, 254 (7th Cir. 2009) (finding any error in ALJ's reliance on two jobs harmless where the plaintiff did "not dispute that 14,500 sedentary fast-food jobs remain available").

## B. RFC/Treating Source Opinion

Plaintiff discusses the treatment she received for her neck and back impairments, before challenging the ALJ's conclusion that an RFC for sedentary work accommodated her pain complaints. (Pl.'s Br. at 10-12.) She contends that the ALJ ignored or failed to evaluate all of the pain complaints she testified to at the hearing, included in her written submissions, and

22

reported to her providers. (Pl.'s Br. at 12.) She then argues, summarily, that the ALJ's findings are not supported by substantial evidence, and that the decision includes no logical bridge between the evidence and the conclusions. (Pl.'s Br. at 13.)

Contrary to plaintiff's suggestion, the ALJ was not required to discuss every pain complaint in the record. See, e.g., Sauer v. Saul, No. 19-C-927, 2020 U.S. Dist. LEXIS 108750, at *35 (E.D. Wis. June 19, 2020) ("The ALJ was not required to quote from all of the notes documenting those complaints."). The ALJ summarized plaintiff's statements in her reports and hearing testimony over two pages of the decision (Tr. at 24-25), before discussing her "long history of cervical spine issues" (Tr. a 25-27) as well as her more recent back pain complaints (Tr. at 27). The ALJ then concluded that an RFC for a range of sedentary work adequately accommodated plaintiff's complaints, explaining that the record did not support greater limitations. (Tr. at 27.) In support of this conclusion, the ALJ relied on the objective medical evidence, examination findings, effectiveness of treatment, plaintiff's daily activities, and her demeanor at the hearing. (Tr. at 25-28.) It is also worth noting that the ALJ did not entirely discount plaintiff's complaints, relying in part on her subjective statements in finding her more limited than the agency medical consultants opined. See SSR 96-9p, 1996 SSR LEXIS 6, at *1 ("An RFC for less than a full range of sedentary work reflects very serious limitations resulting from an individual's medical impairment (s) and is expected to be relatively rare."). The ALJ's decision shows that she considered the important evidence and adequately explained the bases for her conclusions.

Plaintiff also challenges the ALJ's assessment of Dr. Dagam's opinions, which, she contends, are supported by and consistent with the evidence. (Pl.'s Br. at 13.) The ALJ's decision shows that she considered the appropriate regulatory factors and reached a

23

reasonable conclusion. The ALJ acknowledged Dr. Dagam's specialty as a neurosurgeon, who performed a multi-level cervical fusion surgery in November 2017 (Tr. at 26), and that he thereafter maintained a treatment relationship with plaintiff up to March 2019 (Tr. at 26-28). Nevertheless, the ALJ found Dr. Dagam's extreme limitations, e.g., that plaintiff could use her hands just 25% of the day and never reach with her arms, inconsistent with the treatment notes showing, e.g., 4/5 and 5/5 strength in the hands (Tr. at 28) and full range of motion in her upper extremities (Tr. at 27). See Zoch, 981 F.3d at 602 (holding that ALJ permissibly discounted treating source report because it conflicted with the objective medical evidence). The ALJ also cited evidence that plaintiff tended to exaggerate her limitations. (Tr. at 28-29.) The ALJ further noted that Dr. Dagam provided no support for the boxes he checked in the form report. (Tr. at 29.)

Plaintiff notes that Dr. Dagam checked "yes" in response to the question: "Does your treatment and care, office visit notes, and/or signs or laboratory findings of your patient form the basis of your opinions unless otherwise stated or indicated?" (Tr. at 996; Pl.'s Br. at 14.) It was not unreasonable for the ALJ to conclude that checking "yes" did not quality as a supporting explanation for the severe limitations Dr. Dagam proposed. See McFadden v. Berryhill, 721 Fed. Appx. 501, 505 (7th Cir. 2018) (holding that the "ALJ reasonably demanded from [a treating doctor] some explanation for finding limitations so much more severe than those recognized by other doctors, and she was entitled to discount his opinion for not providing that explanation").

Finally, the ALJ found "overall persuasive" the opinions of the agency consultants that plaintiff could perform a range of full-time, light work. See Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004) ("An ALJ may discount a treating physician's medical opinion if it is

24

inconsistent with the opinion of a consulting physician[.]").  Plaintiff makes no argument that the ALJ erred in this regard.

## C.    Symptom Evaluation

Plaintiff faults the ALJ for using boilerplate language, i.e., that plaintiff's statements about her symptoms and limitations were "not entirely consistent" with the evidence.  (Pl.'s Br. at 16; Tr. at 25.)  As courts have repeatedly noted, such boilerplate is harmless where the ALJ otherwise sets forth the correct legal standards, e.g., Harris v. Saul, 835 Fed. Appx. 881, 886 (7th Cir. 2020), and goes on to provide specific reasons for her conclusion, e.g., Burmester v. Berryhill, 920 F.3d 507, 510 (7th Cir. 2019); Loveless v. Colvin, 810 F.3d 502, 508 (7th Cir. 2016); Pepper v. Colvin, 712 F.3d 351, 367-68 (7th Cir. 2013).  In the present case, the ALJ set forth the standards from 20 C.F.R. § 404.1529 and SSR 16-3p (Tr. at 23), and she explained why she discounted plaintiff's allegations of greater limitations (Tr. at 25-28).

Plaintiff contends that the ALJ erred by failing to identify which of plaintiff's statements were given weight, which were not, and why.  (Pl.'s Br. at 16.)  But "an ALJ's credibility findings need not specify which statements were not credible."  Shideler, 688 F.3d at 312.  Plaintiff also contends that her statements contained facts that would preclude the sustained, full-time work required by SSR 96-8p.  (Pl.'s Br. at 17.)  However, plaintiff does not otherwise develop the argument, and the ALJ concluded that plaintiff had the RFC for a range of full-time sedentary work.  Cf. Jeske, 955 F.3d at 596 ("We join our sister courts, however, in concluding that a decision lacking a seven-part function-by-function written account of the claimant's exertional capacity [under SSR 96-8p] does not necessarily require remand.").

Plaintiff next notes that an ALJ may not reject a claimant's statements simply because they are unsupported by objective medical evidence.  (Pl.'s Br. at 17.)  The ALJ did not suggest

25

otherwise; she considered the objective evidence, as she was permitted to do, see Jones v. Astrue, 623 F.3d 1155, 1161 (7th Cir. 2010) ("Although an ALJ may not ignore a claimant's subjective reports of pain simply because they are not supported by the medical evidence, discrepancies between the objective evidence and self-reports may suggest symptom exaggeration."); Arnold v. Barnhart, 473 F.3d 816, 823 (7th Cir. 2007) ("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."), in addition to plaintiff's treatment, daily activities, and demeanor at the hearing.

Finally, plaintiff challenges the reasons the ALJ did provide. (Pl.'s Br. at 18-21.) As indicated above, the ALJ considered plaintiff's subjective statements about her symptoms and limitations (Tr. at 24-25), the objective medical and opinion evidence, plaintiff's treatment history, and her daily activities (Tr. at 25-28), consistent with the regulations. Her resultant findings may be overturned on review only if they are "patently wrong." Plaintiff cannot make such a showing.

Plaintiff takes issue with the ALJ's finding that, while plaintiff testified to problems walking, there was no evidence of her using an assistive device. Plaintiff notes that she never testified or claimed that she needed an assistive device. (Pl.'s Br. at 19.) The ALJ's point here appears to be that, if plaintiff's symptoms were truly as debilitating as she claimed, she would have used a cane to avoid falling.

Plaintiff next takes issue with the ALJ's skepticism over plaintiff's claimed difficulties in washing her hair, holding a spoon, and doing laundry. (Pl.'s Br. at 19.) As the ALJ explained, these claims were inconsistent with the exam findings of mildly diminished or full hand strength, full range of motion of the upper extremities, and plaintiff's other reported activities, including diapering her child and driving even short distances. (Tr. at 25, 28.) Plaintiff notes that the

26

record contains some objective support for hand and arm weakness, but the ALJ discussed this evidence, as plaintiff acknowledges (Pl.'s Br. at 19-20), including in the RFC limitations on lifting, reaching, and handling in response.

Plaintiff contends that the ALJ cherry-picked the evidence in discussing her daily activities (Pl.'s Br. at 20), but the ALJ's decision shows that she fairly considered plaintiff's claimed limitations in those activities. The ALJ also cited a July 2018 medical note in which plaintiff told the provider she was independent in her ADLs. (Tr. at 28, 600.) Plaintiff complains that the ALJ failed to mention other portions of this note in which she reported severe pain impacting her ability to perform chores (Pl.'s Br. at 20-21; Tr. at 599), but an ALJ need not comment on every line of the claimant's treatment notes. Kolar v. Berryhill, 695 Fed. Appx. 161, 161-62 (7th Cir. 2017).[1]

Plaintiff criticizes the ALJ's observation that plaintiff "sat comfortably at the hearing" (Tr. at 28), noting that this was a relatively brief proceeding conducted by video-teleconferencing (Pl.'s Br. at 21). The Seventh Circuit has expressed unease with the use of a "sit and squirm" testing for evaluating a claimant's pain complaints, but it is permissible for an ALJ to rely on her own observations at the hearing in determining credibility. Powers v. Apfel, 207 F.3d 431, 436 (7th Cir. 2000). Plaintiff cites no authority that this was improper. In any event, even if it was, the ALJ provided other reasons for her finding.[2] See Halsell v. Astrue, 357 Fed. Appx. 717, 722-23 (7th Cir. 2009) ("Not all of the ALJ's reasons must be valid as long as enough of them

_____

[1]As indicated above, in discounting Dr. Dagam's opinion the ALJ also cited a provider's note suggesting that plaintiff was exaggerating her symptoms. (Tr. at 28-29.)

[2]The ALJ also included in the RFC the option to stand for a minute or two after 30 minutes of sitting, despite her observation that plaintiff was able to sit for 41 minutes at the hearing. (See Tr. at 38, 69, noting that the hearing started at 1:07 and ended at 1:48.)

are[.]").

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the Commissioner's decision is affirmed, and this case is dismissed.  The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 30th day of March, 2021.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

28